**UNITED STATES of America,
Appellee,**

v.

**Richard M. PENTA, Defendant,
Appellant.**

**No. 72–1331.**

United States Court of Appeals,
First Circuit.

Argued Jan. 5, 1973.

Decided March 7, 1973.

Paul F. Sweeney, Boston, Mass., for defendant, appellant.

Richard E. Bachman, Asst. U. S. Atty., with whom James N. Gabriel, U. S. Atty., was on brief, for appellee.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

In June, 1970, appellant Penta was convicted of fraudulently possessing and transferring counterfeit Federal Reserve Notes in violation of 18 U.S.C. §§ 472 and 473. His sole defense was that he was entrapped by an alleged government agent. We affirmed the conviction in December, 1970, in an unpublished memorandum and order. Subsequently, in May, 1972, in a post-conviction collateral proceeding, the Massachusetts Supreme Judicial Court reversed earlier state court convictions of appellant in the mid-1960's for concealing stolen motor vehicles, on the basis that some of the evidence introduced resulted from an illegal search and seizure. Commonwealth v. Penta, 1972 Mass.Adv.Sh. 1015, 282 N.E.2d 674.[1] Since these con-

---

1. The search warrants involved did not comply with Mass.Gen.Laws ch. 276, § 2B, which, as it has not been contended otherwise, we take to furnish constitutional minima.

victions had been used in the 1970 federal trial to impeach appellant's credibility, he moved for a new trial and appeals from the denial thereof.

Initially we are met with the government's contention, superficially appealing, that appellant may not be heard to complain about the use of the state convictions by the prosecutor on cross-examination since his own trial counsel elicited admissions of these convictions from him on direct examination. While there is some authority for the view that a defendant who first raises the issue of his prior convictions cannot complain of prosecutorial reference thereto, that rule is based upon the premise that the convictions were properly admissible in the first place to impeach the defendant's credibility and might have been inquired into by the prosecutor in the face of a defendant's silence on direct examination. Bohol v. United States, 227 F. 2d 330 (9th Cir. 1955); United States v. Menk, 406 F.2d 124 (7th Cir. 1968) cert. denied, 395 U.S. 946, 89 S.Ct. 2019, 23 L.Ed.2d 464 (1969). That is a far cry from what we take to be the claim here: that while the state convictions may have been properly admissible at the time of the federal trial, their subsequent reversal requires a new federal trial. Moreover, we cannot fault appellant's trial counsel who, apparently acting in good faith, introduced into evidence appellant's prior state convictions, so as to prevent the prosecutor, on cross-examination, from stunning the jury by being first to bring these skeletons out of what otherwise might have been viewed as the defendant's deceptively clean closet.[2] We thus address appellant's argument.

Appellant does not deny that he committed the act in question, but rather argues that he was entrapped by one O'Connell, a former business associate acting as a government agent. His story is that O'Connell owed him several thousand dollars, which O'Connell said could be paid only if appellant helped him, as a middleman, to sell counterfeit money. O'Connell supposedly approached appellant on December 3, 1969, with this request which was allegedly consistently refused until December 10, the morning of the sale. From the testimony of government agent Hurley it appears that O'Connell first told Hurley on December 9 that an unnamed friend of his wished to sell counterfeit money. At that time Hurley told O'Connell that he "would see what [he] could do for [O'Connell]" on account of his help.[3] Late at night, after viewing samples of the counterfeit money, Hurley instructed O'Connell how to continue dealing with appellant and set up a meeting preceding the sale. Appellant's name was never revealed to Hurley, despite his continual questioning, until one hour before the meeting on December 10.

At the conclusion of appellant's testimony his trial counsel asked him about his prior convictions and parole status, all of which he openly admitted. Assuming arguendo that after O'Connell's December 9 visits with Hurley he could be said to have become a government agent—an issue sent to the jury—only then would appellant's credibility be crucial to his defense of entrapment. See generally Kadis v. United States, 373 F. 2d 370 (1st Cir. 1967). In that situation, appellant alleges—and we will assume so at this juncture—that the evi-

2. Of course, where a defendant's counsel introduces prior convictions which he knows to be illegal or which so appear on their face—e. g., those resulting from deprivation of counsel—then there is a far greater reason to accept the government's estoppel argument. While there might be the possibility that a defense lawyer could, where the legality of the prior convictions is less clear, seed the record with anticipated errors relating to the prior convictions, and upon his client's conviction seek to attack the prior convictions in the hope that if successful, the subsequent conviction would also fall, that game of Russian roulette seems improbable, and, in any event, our disposition here removes that concern.

3. O'Connell, who did not testify in this case, subsequently received a reward of $2000.

dence of prior convictions must have affected the jury's view of his veracity. Consequently we must determine if the subsequent reversal of those convictions requires a new trial on the counterfeiting charge.

It has recently been decided that if a conviction is based in part, on the use of prior convictions which are constitutionally invalid due to lack of counsel and which were introduced to impeach a defendant's credibility, it must be set aside if there is no harmless error. Loper v. Beto, 405 U.S. 473, 92 S.Ct. 1014, 31 L. Ed.2d 374 (1972). See also Burgett v. Texas, 389 U.S. 109, 88 S.Ct. 258, 19 L. Ed.2d 319 (1967); United States v. Tucker, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972). While the Supreme Court had before it in Loper the broad question "Does the use of prior, void convictions for impeachment purposes deprive a criminal defendant of due process of law where their use might well have influenced the outcome of the case", in its resolution of that issue in the particular fact situation before it, the Court drew exclusively upon the rationale behind the rule in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), which "goes to 'the very integrity of the fact-finding process' in criminal trials" and recognizes that convictions of uncounseled defendant lack reliability. Loper, supra, 405 U.S. at 484, 92 S.Ct. at 1019. Beto v. Stacks, 408 F.2d 313 (5th Cir. 1969), involving a factual situation virtually identical to the one before us now, addressed the problem of prior convictions subsequently found invalid because of an illegal search or seizure and could find no controlling distinction between Fourth and Sixth Amendment rights which would support a conclusion different from Burgett, the predecessor to Loper. It said that "while it is true that the use of evidence resulting from an unlawful search and seizure is less likely to affect the integrity of the fact-finding process than the denial of counsel at trial . . . the creation of such a con-stitutional hierarchy is not part of the rationale of Burgett." Id. at 316.

In light of subsequent developments involving the exclusionary rule and Stacks' omission of any discussion of Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), see infra, we feel compelled to examine anew the issue in Stacks. We agree that the use of evidence obtained from an unlawful search and seizure has a definite influence on the fact-finding process, but in a very different way from deprivation of counsel. Such evidence tends to make the resulting conviction more, not less trustworthy. There is no lack of reliability as there was in Loper.

If the use of appellant's prior state convictions, subsequently found to suffer from a constitutional defect, require that his federal conviction be vacated absent harmless error, it is only because the fruits of the poisonous tree now contain this additional genus. But an examination of the roots of that tree and recent actions to limit its growth require rejection of appellant's claim. The exclusionary rule has been called a deterrent against future illegal police conduct. "Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed. 2d 1669 (1960). And long ago, Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), established the rule as a remedy for violations of the offender's Fourth Amendment rights.

When these principles are examined in an effort to apply the exclusionary rule here, they give little support to appellant. Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) permitted the introduction into evidence of a confession relating to the offenses charged which was uncoerced, hence apparently trustworthy, but otherwise inadmissible under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The confession was used as

a means of impeaching a defendant who had testified falsely on direct examination as to matters bearing quite directly on those offenses. *But cf.* Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925). And earlier *Walder* allowed the admission of evidence which was illegally seized in a prior unrelated action to impeach a defendant who had testified falsely on direct examination as to matters collateral to the trial at which the evidence was admitted. Concededly, the otherwise inadmissible but trustworthy confessions and physical evidence in *Harris* and *Walder* were used to directly contradict specific false statements made on direct examination, and not to attack the defendant's credibility in a more general manner.[4] Yet it appears that the controlling rationale was that the valuable aid to assessing the defendant's credibility should not be lost "because of the speculative possibility that impermissible police conduct will be encouraged thereby . . . . [S]ufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief." *Harris, supra,* 401 U.S. at 225, 91 S.Ct. at 645. We think that the deterrent effect in instances like the one before us is similarly speculative.

If the exclusionary rule's application in these circumstances is sought to be justified as a remedy for violation of appellant's Fourth Amendment rights many years ago by Massachusetts police, we think that the suggested cure is worse than the disease. First, appellant has already received a remedy which is the most appropriate—his prior convictions were reversed. But more fundamentally, at the time of the federal trial the Massachusetts Supreme Judicial Court had already affirmed appellant's state convictions. Commonwealth v. Penta, 352 Mass. 271, 225 N.E.2d 58. (1967). There was not the least hint or suggestion that those convictions were invalid.[5] The situation is far different from cases like *Loper* where a trial judge could rather easily resolve a deprivation of counsel claim by reference to a defendant's sworn statements and trial court records of prior convictions. It would play havoc with our court system to require a judge to conduct side-trials into the allegedly invalid prior convictions to determine the legality of a search or seizure. *See* United States v. Wendt, 347 F.Supp. 647 (N.D.Ga. 1972) (dictum). We do not think that the theoretical possibilities regarding additional police deterrence or the need to effectively remedy violations of Fourth Amendment rights can serve as the justification for imposing such heavy burdens on our courts.

■■ Nothing we have said so far is meant to suggest that we would condone introduction of the state convictions had they been overturned, on the basis of the illegal search, prior to the time of the federal trial. We note that appellant did not testify falsely on direct examination as to matters which could be specif-

---

4. The Court in *Loper, supra,* 405 U.S. at 482 n. 11, 92 S.Ct. 1014, 31 L.Ed.2d 374, noted this distinction in contrasting the use of uncounseled convictions to impeach general credibility in the case before it with the more specific contradictions in *Harris* and *Walder.* While an argument can be made to the contrary, we do not think, because of the policies underlying application of the rule of exclusion for illegal search, that this footnote should be considered as requiring a finding of error where prior convictions, used only for general impeachment purposes, are subsequently reversed; nor because of the entire thrust of the text in *Loper,* do we think that the footnote should be read as indicating that *Loper* applies in a Fourth Amendment as well as a Sixth Amendment context.

5. Appellant waited until November, 1970, to challenge these convictions in a federal habeas corpus suit which was dismissed without prejudice in March, 1971, for failure to exhaust state remedies. We need not reach the question whether the exclusionary rule might have some application where an appeal or some other proceeding which challenges the legality of the prior convictions on search and seizure grounds is pending. *Cf.* F.R.Evid. 609 (e).

ically contradicted by reference to the prior convictions or acts as was done in *Walder* and *Harris* where the Court desired to prevent the affirmative use of perjured testimony by a defendant. No case has gone so far to suggest that the prosecution might introduce what has already been determined to be illegally obtained evidence from prior unrelated acts or convictions to impeach generally a defendant's credibility and this contention appears to have been rejected in People v. Taylor, 104 Cal.Rptr. 350, 501 P.2d 918 (1972).[6] In that situation the exclusionary rule does not interfere with the orderly functioning of the judicial system. Additionally, a contrary holding might otherwise affect the defendant's choice of whether to testify in his own behalf. *Harris, supra,* 401 U.S. at 230, 91 S.Ct. 643, 28 L.Ed.2d 1 (Brennan, J., dissenting). We only go so far as to hold that a conviction which may have been influenced by the use, for general impeachment purposes, of prior convictions, which have been subsequently overturned on constitutional grounds relating to an illegal search or seizure, may properly stand.

■ To the extent that we may be incorrect in reading the recent Supreme Court holdings as requiring rejection of appellant's claim, we still believe that the use of the prior convictions constituted harmless error beyond a reasonable doubt. Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 258 (1972). First, appellant's credibility on his entrapment defense was greatly harmed by evidence relevant to predisposition that he had been charged with possession of burglar tools in the past. Second, his story was contradicted directly in part by government agents who testified to appellant's suede coat being dry—though he alleged having walked some three blocks in a rainstorm to the place of the sale—and to his having stated, after being warned of his right to remain silent, that he had been sent out with some money to obtain some bread and had returned with neither money nor bread—a fact appellant denied at trial. Though appellant may have been incorrect in his testimony on these points and still may have been capable of being believed as to his story of entrapment in the main, we think that the use of the convictions when considered in this context added no more than minimally to the enormous damage already done to his credibility.

Affirmed.

ALDRICH, Senior Judge (concurring).

I am happy to go along with the court's opinion, but I believe there is a shorter approach. The close decision in *Loper* seems clearly to have turned on the lack of integrity, or reliability, of the prior fact finding process. Since the Court has given retroactive effect to Gideon v. Wainwright, 1963, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799; Doughty v. Maxwell, 1964, 376 U.S. 202, 84 S.Ct. 702, 11 L.Ed.2d 650, reversing Doughty v. Sacks, 1963, 175 Ohio St. 46, 191 N.E.2d 727; *see* Pickelsimer v. Wainwright, 1963, 375 U.S. 2, 3–4, 84 S.Ct. 80, 11 L.Ed.2d 41 (Harlan, J., dissenting), the *Loper* holding is a logical extension of that case. The Court, however, has not given retroactive effect to Mapp v. Ohio, 1961, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081; *see* Linkletter v. Walker, 1965, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601; Desist v. United States, 1969, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248, and the reasons given by the Court for distinguishing *Gideon* from *Mapp* convince me that, with due respect to Beto v. Stacks, 5 Cir., 1969, 408 F.2d 313, the nature of the constitutional defect does make a difference in this kind of case. Basically the *Mapp* rule was of constitutional proportions because of its prophylactic importance,

6. If *Taylor* is correct, there would seem to be a prohibition on prosecutorial reference to either the voided prior convictions or evidence discovered as the result of an illegal search or seizure in an effort to impeach generally.

rather than because of its prejudicial effect on the defendant's trial. *See* 367 U.S. at 652, and at 656, 81 S.Ct. 1684, quoting from Elkins v. United States, 364 U.S. 206 at 217, 80 S.Ct. 1437, 4 L. Ed.2d 1669. Even though in the case at bar the vulnerable prior conviction was post *Mapp*, I cannot believe the Court would apply the *Loper* rule in a Fourth Amendment case. Indeed, we may be said to have foreshadowed this distinction in Gilday v. Scafati, 1 Cir., 1970, 428 F.2d 1027.